LOCOMOTIVE ENGINEERS' MUTUAL LIFE AND ACCIDENT
INSURANCE ASSOCIATION

*v.*

FANNIE WINTERSTEIN et al.

[Filed October 7th, 1899.]

1. A certificate issued by a beneficial insurance association upon the life of a member in favor of a third person, where neither the constitution nor by-laws of the society nor the certificate confer upon the members a power to change the beneficiary, invests the beneficiary with a vested interest in the certificate.

2. The member cannot defeat such vested interest by surrendering the old and taking out a new certificate.

3. In case of such change of certificates, the extent of the vested right of the beneficiary in the old certificate is its value at the time of the change.

4. In this kind of insurance the value is the difference between the amount payable upon the death of the member and the amount of payments, with interest, which will be required to keep the certificate alive during the probable period of the member's life.

5. A by-law adopted after the issuance of the certificate, giving a member power to change a beneficiary, held not to be retroactive.

The Locomotive Engineers' Mutual Life and Accident Insurance Association was incorporated in 1894. Before that time the organization had existed and insured lives as a voluntary association. In 1884, George Winterstein, a locomotive engineer, insured his life in said association in one policy for $3,000 for the benefit of his second wife, who was then living. This wife died on November 14th, 1889. After her death George Winterstein went from Easton, where he had lived, taking with him his daughter Fannie, to live at Mauch Chunk with his brother John and sister Martha Winterstein. After his wife's death he sent the policy of insurance back to the company's office in Cleveland, Ohio, and caused a new policy for $3,000 to be issued, payable to his daughter Fannie. This seems to have been about January 1st, 1890. Some time after this he moved from Mauch Chunk to Phillipsburg, and left

Fannie and the policy of insurance with his sister Martha at Mauch Chunk. In April, 1894, while he was boarding at Phillipsburg, New Jersey, he married Julia Rustay. Julia says that he told her, before their marriage, that if she would marry him he would give her his insurance in the brotherhood of engineers. After the marriage George, who was running his engine between Phillipsburg and Mauch Chunk, saw his daughter Fannie, or his sister Martha, or both, at the station at Mauch Chunk, and told her or them that he had to have new policies issued on account of the association making a new constitution and by-laws, and requested that the old policies should be sent to him. His sister gave the policies to Fannie, who met her father at the station and gave the papers to him. It seems to be a fact that the voluntary association, after it became incorporated, called in all outstanding policies and issued new certificates in their stead. George upon receiving the old policies forwarded them to the company, and caused to be issued in their stead two new policies for $1,500 each on July 18th, 1894, payable, not to Fannie, his daughter, but to his third wife, Mrs. George Winterstein. These two policies seem to have been delivered to the beneficiary. This was the condition of affairs until April 21st, 1897, on which date George again caused a new certificate to be issued to his daughter Fannie, and seven days later, April 28th, 1897, he died. The amount of the benefit fund is claimed on the one hand by Fannie, the daughter, and on the other hand by Julia, the widow. The company have filed a bill of interpleader and paid the amount into court, and Fannie and Julia now interplead.

*Mr. John I. B. Reiley* and *Mr. William H. Morrow*, for the defendant Julia Winterstein.

*Mr. Sylvester C. Smith*, for the defendant Fannie Winterstein.

REED, V. C.

The policy issued in 1894, in which the wife was named as beneficiary, was in her possession at the time of the death of

Locomotive Engineers' Ins. Ass'n v. Winterstein.

her husband, but as already remarked, he had, in the manner pointed out by the by-laws, changed the beneficiary in 1897 and substituted his daughter for his wife. If George, as a member of the order of locomotive engineers, had the power in 1897 to change the beneficiary, then having executed the change in conformity with the rules of the order, the fund belongs to his daughter Fannie.

But the claim made on behalf of the widow is, that she had a vested interest in the policy, of which she was not divested by the attempted change in the beneficiary made in 1897. This claim of a vested interest is put upon two grounds—first, that there was no power in the insured to change the beneficiary in any event; and second, that the policy was issued to her in consideration of marriage, and therefore she held it for a valuable consideration. The question whether apart from the consideration of marriage there was a vested right in the wife, which could not be defeated by the subsequent change of beneficiary, must be answered by the construction of the plan of insurance itself. The question of the power of a person insured to strip a named beneficiary of all interest in the policy and transfer it to another arises in two classes of insurance contracts. One class is the ordinary class of life insurance and the other class is where the contract is executed by a beneficial society. In the first class the beneficiary is named in the original contract and becomes a party to the contract, whose interest becomes vested at once. *Bliss L. Ins.* § *318; Stone* v. *Hackett, 12 Gray 227; Ferdon* v. *Canfield, 104 N. Y. 143; Landrum* v. *Knowles, 7 C. E. Gr. 594.*

In certificates given by beneficial orders there is usually merely a power conferred upon the member whose life is insured, to appoint beneficiaries from a certain class of relations and change the same. In this class of policies the contract is held to be made solely with the member, and that the beneficiary appointed has only a contingent interest in the policy, of which he is liable to be stripped by the member naming a new beneficiary in the manner required by the rules of the association. *Bac. Ben. Soc.* § *289.*

But the presence or absence of the unlimited power of change

of beneficiary depends, not upon the character of the association which insured, but upon the form of the contract entered into with the insured. The right to change a beneficiary may exist in a policy written by a regular company, if it is so stipulated; or it may be non-existent in a certificate written by a beneficial order, if the instrument is to be so construed. The form of policy usually written by a regular company differs from the form of a certificate ordinarily issued by a beneficial association, and these differences account for the general rule that in the former the named beneficiary can and in the latter cannot be changed. The existence, therefore, of a power to change the beneficiary must be sought for in the contract which is entered into between the insuring organization and the insured. General language, indeed, may be found in the opinions in a few cases which indicates a view that a right to change a beneficiary springs from the fact that the certificate is written by a beneficial order. But a close examination of the numerous cases in which this power has been recognized discloses that, almost without exception, the power has been discovered in some provision in the charter, constitution, by-laws of the order, or in the certificate written in the particular instance, or in an absence of a delivery of the certificate.

The few cases holding a different rule are mostly grounded upon the case of *Masonic Benefit Society* v. *Burkhart, 110 Ind. 189.* That case was based upon a *dictum* in the case of *Presbyterian Mutual Fund* v. *Allen,* in support of which *dictum* a number of cases were cited which, with one exception in my judgment, fail to sustain it.

The contract of a beneficial association with its members is made up of the application for membership, the certificate issued, which is an acceptance of the application, and the charter, constitution and by-laws of the society, and in its construction and effect does not differ essentially from an ordinary policy of insurance. *Holland* v. *Chosen Friends, 25 Vr. 490; Golden Star Fraternity* v. *Martin, 30 Vr. 207; American Legion of Honor* v. *Smith, 18 Stew. Eq. 466.*

Locomotive Engineers' Ins. Ass'n v. Winterstein.

The point to be ascertained, therefore, is what was the contract entered into by the complainant?

Neither the original certificates issued, in which the second Mrs. George Winterstein was the named beneficiary, nor the second certificate, in which the daughter Fannie was named, are in evidence. These papers were delivered up to the association and destroyed. Both of these contracts were with the unincorporated association. The two policies issued, in which the third Mrs. George Winterstein is the beneficiary, and the last policy issued, in which Fannie is named, were both issued after the incorporation of the association, and are in evidence. These three policies are substantially in the same form, of which the following is a copy.

The italicised words are in writing and the rest is printed.

> "Organized December 3d, 1867.
> "Incorporated March 1st, 1894.

"Locomotive Engineers' Mutual Life and Accident Insurance Association.

| "Certificate of Membership No. 4657 | 1 | & Policy of Life Insurance. |
|---|---|---|

"This certifies that *George Winterstein* was admitted a member of this association this *nineteenth* day of *July, 1884.*

"Cleveland, O., *July 18, 1894.*     *A. B. Youngson,* Prest.
"*Harry C. Hays,* Gen. Secy. & Treas.

"All payments of benefits that may accrue or become due to the heirs of the person insured by virtue of this policy will be payable to *Mrs. Geo. Winterstein wife* or his lawful heirs.

"Which cannot exceed the amount the association shall be able to pay from the assessments."

The other certificate to the second Mrs. Winterstein is the same as the first, with the single difference that it is No. 4658.

The last certificate to Fannie of April 21st, 1897, is drawn in the same form, with the exception that the printed words "his lawful heirs" after the words "Fannie Winterstein, daughter," are erased. Although the form of the certificate issued before the incorporation of the company is not proved, I have no doubt that they were in the same form.

In regard to the constitution and by-laws of the association, it seems never to have had a constitution—at least none is offered in evidence. The by-laws offered in evidence are those adopted after its incorporation in 1894. Whether these by-laws were copies of regulations adopted by the voluntary association does not appear.

The incorporation seems to have been effected under the revised statutes of Ohio of 1891. *Rev. Stat. 1891 § 3630.* This statute, which is the charter of the incorporated association, confines the benefit of the insured to her or to one of the family insured. *Mutual Aid Association* v. *Gonser, 43 Ohio St. 1.*

The statute is silent concerning the change of beneficiaries. The by-laws adopted March 3d, 1894, just after the incorporation of the association, are also silent upon this point; so that up to May, 1896, there is nothing to show that there was ever anything in the regulations, charter or by-laws respecting the change of beneficiaries.

In the absence of a power to change the beneficiary the beneficiary once named obtained a vested interest in the certificate. This was so held by the Supreme Court of Colorado in construing a certificate issued by this association in the case of *Love* v. *Clune, 24 Col. 237.*

In May, 1896, the following by-law was adopted: "A policyholder of this association, having designated his beneficiary or beneficiaries, may change the same at his pleasure without notice to or consent of the beneficiary or beneficiaries by returning former certificates issued to the home office, and informing the president and general secretary of the changes desired. Person or persons named as beneficiary or beneficiaries, accepting any interest in the policy or certificate issued by this association, do so upon the express terms and conditions contained in this article."

At the time of the adoption of this by-law, the beneficiary was the third Mrs. Winterstein, the widow. The change to Fannie was not made till April, 1897. It may be remarked at this point that the adoption of this by-law in May, 1896, leads to

the inference that it was the first provision of this kind in the history of the association.

The insistence of the counsel for Mrs. Winterstein is that there was no power existing before the adoption of this by-law to change the beneficiaries, and that Mrs. Winterstein had a vested interest in the policy at the time of the adoption of the by-law; and further, that the by-law was not intended to affect existing certificates.

I think the insistence that the by-law was not intended to retroact is correct. The concluding clause of the by-law, which provides that persons named as beneficiaries accepting any interest in the policy or certificate issued by this association, do so upon the express terms and conditions contained in this article, undoubtedly refers to future beneficiaries.

Nor do I see how the contracts of insurance made by this association, so far as they are displayed by the testimony, differ in respect to the point in question from the contract of an ordinary insurance company. The contract is that the benefits will be payable to the named beneficiary. It is not a contract that they shall be payable to the person to be named by the member. The beneficiary is in the first instance named by the member just as the beneficiary in an ordinary life insurance policy is named by the person who effects the insurance; but it is not the power to name the beneficiary, but the power to change the beneficiary that strips such beneficiary of any vested interest in the policy when it is once executed and delivered. Therefore, if the two certificates of 1894 had been the first of a series of policies issued to George Winterstein, I would be of the opinion that her right to the fund would be unaffected by the change of beneficiary executed in April, 1897.

But these two policies were not the first of the series, for, as we have already seen, a policy was issued for the benefit of the second wife, and also a policy for the benefit of the daughter, preceding the issuance of the policy to the present widow. In my judgment all these policies must be considered a part of the series, although issued in part by the association while voluntary and in part while incorporated. The delivery of the old policies

and issuance of new ones would not break the continuity of the insurance. *Olmstead* v. *Reys, 85 N. Y. 598; Whitehead* v. *New York Life Insurance Co., 102 N. Y. 143.*

The question then is, what effect upon the otherwise vested right of the widow in her policies did the issuance of the preceding policies have?

The first-named beneficiary, the second Mrs. Winterstein, died in 1889. Ordinarily where the insured survives those specified to take at his death, the insurance money, where no other disposition is made of it, becomes, at his death, a part of his estate to be administered as his will, or in the absence of a will, as the law may direct. *13 Encycl. L. 654.* Under this rule, upon the death of the beneficiary, the right in the policy reverted to George Winterstein. The first beneficiary was also the wife of the member insured; therefore, even if upon her death her interest in the policy went to her estate, her husband would take it as her administrator *juri mariti,* and his subsequent act in causing the policy to be re-issued to his daughter would amount to a gift to her of his interest.

So when the certificate was issued to Fannie it was equivalent to the issuance of a new policy. Therefore, if what has been said in respect to the policies issued to the present widow is correct, it is equally applicable to the policy issued to Fannie, and if the widow would have taken a vested interest in her policy had it been first of the series, Fannie took a vested interest in this policy for like reasons.

Indeed the only answer made to this position is that the member has a right to change his beneficiary until the policy is actually delivered to such beneficiary, and it is insisted that it is not proved that George ever delivered the certificate to Fannie.

There is a line of cases so holding: *Lemon* v. *Phœnix Mutual Life Insurance Co., 38 Conn. 301; Johnson* y. *Van Epps, 110 Ill. 551.*

But it seems to me that where an ordinary policy of life insurance is written upon the life of one person, in favor of another, at the instance of the former, and is delivered to him, and he holds it for years, making the payments of assessments

Locomotive Engineers' Ins. Ass'n v. Winterstein.

upon the same, it amounts to a settlement upon or gift to the beneficiary, even if the former person had not handed it over to the beneficiary. When such a policy is issued and delivered to the person whose life is insured the contract is complete. The right of the beneficiary to such money upon the death of the insured becomes perfect from the moment of delivery to the latter. If the insured dies the company is bound by its contract to pay the beneficiary the fund. In what respect could this right be enlarged by a delivery of the policy to the beneficiary? and if the right was completed by reason of the delivery of the policy to the latter, how could such right be defeated by the acts of the company and the insured, to which acts the beneficiary was a stranger? In my judgment, the policy itself, when accepted by the insured member, becomes a declaration of the trust in favor of the beneficiary and subsequent payment of premiums or assessments upon the policy are gifts to the beneficiary. In *Whitehead* v. *New York Life Insurance Co., supra,* there was no delivery to the beneficiary.

But there is evidence of a delivery of these policies to Fannie. It is to be recalled that after the death of Fannie's mother, George and she, who were living at Easton, went to live with John and Martha Winterstein, at Mauch Chunk.

Martha, in whose charge Fannie was, says distinctly that after the change of policies in favor of Fannie she had possession of those policies and that George himself left them with her. The policies seem to have been kept in a drawer of a bureau which belonged to the mother of George, John and Martha, at the homestead. The mother was living when Fannie's mother died, and when George left and went back to Phillipsburg to live the policies were left at Mauch Chunk, with Martha, who says she had no other papers of George but this policy. John Winterstein says that his sister had possession of the policy.

I think that, in view of these conditions—the testimony of Martha and John—it appears that the policy was left in charge of Martha, who had charge of Fannie, to be used for Fannie's benefit in case anything happened to the father, and that this is to be regarded as a delivery of the policy to Fannie herself.

But, assuming that Fannie had a vested interest, the question remains, what was the character of that interest?.

The case of *Landrum* v. *Knowles, 7 C. E. Gr. 594,* dealt with this question. An ordinary life insurance was taken by a wife on the life of her husband and made payable to her children. After the payment of several premiums she assigned the policy in payment of the debts of her husband, and thereafter the assignee paid the premiums up to the death of her husband. It was held that the children were entitled only to the value of the policy at the time of the assignment.

This result was arrived at by regarding the payments made by the mother as executed gifts to the children. That case differs from the present case in the particular that here the premiums were all paid by the father. But I do not see how it differs in principle. Suppose the wife in the former case had agreed with the assignee to keep the premiums paid. The payments, after such assignment, would have been made, not for the benefit of the children but of the assignee. She would have unmistakably so announced. How, then, could such payments have been regarded as gifts to the children? Now, here the father, after the new certificates were issued to his wife, was paying his assessments as gifts to his wife. The vested interest of his child, therefore, would be confined to the value which had been given to the certificate by his previous payments. In the kind of policy before the court in the case of *Landrum* v. *Knowles, supra,* its cash value at the time was readily computable. But in the kind of insurance now before the court, how is the value of a policy at any particular time to be calculated? That it may have a value seems clear. A member, by reason of age or disease, may have become uninsurable upon a new application, for, by the by-laws, no sick member or member over the age of fifty is eligible for insurance. The subsisting policy, therefore, may have obtained a value, for the reason that, on account of age or sickness of the insured member, the future assessments would be obviously much less than the amount to be received at the member's death. The value of each policy may vary, therefore, according to the age and health of the insured. A general

rule for the ascertainment of the value of such a policy at any particular date would seem to be this: deduct from the amount of money payable upon the death of the insured the amount of future assessments and dues, with interest from the time of their payment up to the time of the member's death. There is in this case nothing to show that the insured at the time of the assignment of the policy to Julia was not in an average condition of health. I therefore think that the policies were worth to Fannie at that time the sum of $3,000, less such future assessments as would have to be paid during a period equal to the probable duration of the life of the insured by the established table of mortality.

No testimony was taken to meet this view of the case, and therefore upon the points indicated—first, the age of the insured when he caused the new certificates to be issued to Julia, and secondly, the amount of assessments and interest which should be payable during the probable life of the insured—I will either myself hear the testimony or refer the taking of the same to a master.